# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 11-CV-539 (JFB) (AKT)

———————————

DENIS J. MONETTE,

Plaintiff,

VERSUS

THE COUNTY OF NASSAU AND LAWRENCE MULVEY,

Defendants.

———————————

**MEMORANDUM AND ORDER**
March 31, 2015

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Dennis Monette ("plaintiff") brought this employment discrimination action against the County of Nassau ("the County") and Lawrence Mulvey ("Mulvey") (collectively "defendants") after he was terminated as Assistant Commissioner of the Nassau County Police Department ("NCPD") on November 13, 2009. His termination occurred ten days after the election for Nassau County Executive, when the result was still unknown and too close to call. In that election, Ed Mangano ("Mangano") ultimately defeated Tom Suozzi ("Suozzi"), who had held the position since 2001. Plaintiff had been a fervent supporter of Suozzi until the 2009 election, when he switched his support to Mangano because plaintiff was frustrated with his treatment by his superior, NCPD Commissioner Mulvey. Plaintiff frequently complained to Suozzi about his treatment, and felt that Suozzi failed to address his concerns.

In this lawsuit, plaintiff alleged that he was fired for several unlawful purposes, including in retaliation for the exercise of his First Amendment right to support Mangano instead of Suozzi. After a trial in January 2014, a jury found for plaintiff on his First Amendment claim against the County,[1] brought under 42 U.S.C. § 1983, and awarded plaintiff $150,000 in compensatory damages. The parties agreed that back pay, front pay, and reinstatement were equitable remedies for the Court's determination, and they have submitted post-trial briefs on these issues, as well as on post-trial motions by the County for

———————————

[1] The only claim against Mulvey as an individual to go to the jury was for aiding and abetting disability discrimination under the NYHRL. (*See* Trial Transcript ("Tr.") at 818.) With respect to the First Amendment claim under § 1983, the jury was instructed that both Mulvey and Suozzi were "policymakers" whose conduct could subject the County to liability. (*See* Jury Charge at 24.)

judgment as a matter of law and a new trial on damages, or remittitur of the $150,000 award.

The three specific issues addressed by the County's post-trial brief are as follows. First, the County renews its motion under Federal Rule of Civil Procedure 50 based on the "policymaker" defense, which was originally presented as a motion to amend defendants' answer to assert that defense. The defense was not in the answer, not in the summary judgment motion (and was disavowed by the County at oral argument on the summary judgment motion), not in the pretrial order, and not raised until a few days before trial. The Court concludes that the motion to amend on the eve of trial was properly denied because of the overwhelming prejudice to the plaintiff of having to respond to such a defense with such late notice. In the alternative, based upon the evidence defendants presented at trial, the Court concludes that the defense does not apply to plaintiff's position (as re-constituted) and, thus, fails on the merits. Next, the County moves for a new trial under Rule 59, arguing that the jury charge's definition of "motivating factor" as an element of the § 1983 claim was improper. This motion is denied because the instruction correctly defined "motivating factor" in accordance with prevailing Second Circuit precedent. Finally, the County seeks a new trial on damages or remittitur of the jury's award of $150,000 in compensatory damages for emotional harm, arguing that the award is unsupported by plaintiff's testimony alone, absent any medical or psychological evidence. This motion is also denied, because this award for emotional damages, given the evidence at trial, does not shock the Court's conscience, and is close in value to awards in other similar cases.

Plaintiff's post-trial brief seeks back pay and either reinstatement or front pay. The Court grants the request for back pay, but only for the period from plaintiff's termination on November 13, 2009, until December 31, 2009, because plaintiff would not foreseeably have continued his employment after Mangano was sworn in as County Executive on January 1, 2010.[2] In particular, even assuming *arguendo* that the County has the burden of proving that the plaintiff's employment would have terminated on December 31, 2009 in the absence of the retaliatory termination on November 13, 2009, the Court concludes that the County has clearly met that burden. There was overwhelming (and uncontroverted) evidence in the record that Police Commissioner Mulvey wanted to terminate plaintiff for over two years (dating back to 2007) for reasons unrelated to plaintiff's political affiliation, but that County Executive Suozzi prevented Mulvey from doing so. Therefore, it was abundantly clear from the trial that, had Suozzi not authorized the termination of plaintiff for retaliatory reasons in November 2009 after the election (as the jury found), Police Commissioner Mulvey (who continued as Police Commissioner under County Executive Mangano) would have terminated plaintiff for non-retaliatory reasons as soon as Suozzi left office. In other words, given that Mulvey wanted to terminate plaintiff for over two years for reasons unrelated to political association, and was only prevented from doing so by Suozzi, allowing plaintiff to recover back pay beyond Suozzi's last day on December 31, 2009 would result in an inequitable windfall to plaintiff that has

_____

[2] Although the record does not reflect the exact date of Mangano's inauguration, the Court takes judicial notice of the fact that it occurred within the Court's territorial jurisdiction on January 1, 2010. *See* Fed. R. Evid. 201(b)(1).

absolutely no basis in the evidence. For the same reason, plaintiff's motion is denied with respect to reinstatement and front pay.

## I. BACKGROUND

### A. Factual Background

Set forth below is a summary of the evidence that was adduced at trial.

Plaintiff joined the NCPD in 1968 (Tr. at 104), and served as a uniformed police officer until 1991, when he retired with a disability pension after sustaining knee and back injuries at a crime scene (*id*. at 116-19). After he retired, plaintiff worked periodically for his family's restaurant, but was not employed full time. (*Id.* at 124.) In 2000, plaintiff met Suozzi, who was preparing to run for Nassau County Executive. (*Id.* at 125.) Plaintiff was introduced to Suozzi by an old friend, Louis Yevoli, and was impressed with Suozzi's credentials and vision for the county. (*Id.* at 125-28.) Plaintiff became a friend and supporter of Suozzi's, hosting fundraisers for him and accompanying him on the campaign trail. (*Id.* at 128-32.) Overall, plaintiff estimated that he raised $210,000 for Suozzi during the 2001 election. (*Id.* at 136.)

After Suozzi was elected, he named plaintiff the Director of Public Safety, based on plaintiff's 22 years of experience in the police department and his ideas about streamlining public safety services. (*Id.* at 145-48.) After five or six months in that position, Suozzi appointed plaintiff as an Assistant Commissioner of the NCPD. (*Id.* at 153.) Initially, plaintiff's new position was dedicated solely to counter-terrorism, and he represented the NCPD as a member of STARCOM, a regional collaboration of local and federal agencies dedicated to sharing intelligence information and coordinating their response to the threat of terrorism. (*Id.* at 202.) However, when new Commissioner James Lawrence arrived a few months later, plaintiff was assigned additional duties involving departmental management, analysis, and planning. (*Id.* at 154.)

Suozzi was re-elected in 2005, and plaintiff supported and raised funds for him in that election as well. (*Id.* at 173-77.) After he was re-elected, Suozzi needed to name a new Commissioner of Police, because Commissioner Lawrence announced his retirement. (*Id.* at 180.) One of the candidates was defendant Mulvey, and Suozzi told plaintiff that he was aware of personal friction between Mulvey and plaintiff. (*Id.* at 181-82.) The friction stemmed from two incidents when both Mulvey and plaintiff were still police officers; one incident involved a search warrant, and the other involved the alleged misappropriation of property in Mulvey's unit. (*Id.* at 182-93.) As a result of his past experiences with plaintiff, Mulvey told a commissioner-selection committee that he would not work with plaintiff because he questioned plaintiff's integrity. (*Id.* at 518.)

Suozzi named Mulvey the NCPD Commissioner in mid-2007. (*Id.* at 194.) Before doing so, he assured Mulvey that plaintiff would not be part of his administration in the NCPD. (*Id.* at 527.) Suozzi later proposed a compromise in which plaintiff would be moved to the Office of Emergency Management (OEM), a separate entity from the police department which was located in a separate facility. (*Id.* at 536.) Mulvey insisted that plaintiff not have authority to order around police and should not be considered critical staff, and Suozzi agreed. (*Id.* at 537.) Instead, plaintiff would serve as a liaison between

the NCPD and OEM, and would continue to administer STARCOM. (*Id.*) Otherwise, Mulvey could assign plaintiff tasks at his discretion. (*Id.*) Suozzi immediately called plaintiff to inform him of the change, and also to inform plaintiff that Suozzi was giving him a raise of between $9,000 and $10,000, despite what plaintiff perceived to be a reduction in his duties. (*Id.* at 202-03; 538.)

Plaintiff was then re-located from the second floor of police headquarters to a cubicle in the basement of a county jail. (*Id.* 204; 539.) Plaintiff complained to Mulvey, Suozzi, Yevoli, and Deputy County Executive for Public Safety Frank Ryan about his working conditions in the basement, which he felt were a form of punishment or harassment because of his history with Mulvey, but there was no action in response to plaintiff's complaints. (*Id.* at 206-09.) Plaintiff remained in the basement cubicle for more than two years, until his termination in November 2009. (*Id.* at 209.) During that period, plaintiff had minimal job responsibilities. (*Id.* at 202.) Although he was located in OEM, he did not attend OEM meetings. (*Id.* at 201.) He continued to attend STARCOM meetings, but had far less of an operational role than he did under Commissioner Lawrence, when he helped to get STARCOM off the ground. (*Id.* at 201-02.) Plaintiff testified that, under Commissioner Mulvey, "there was no function for me to perform." (*Id.*) Mulvey testified that he assigned plaintiff one drill to work on, but ultimately relieved him even from that, and plaintiff did not have a measurable impact on the operations of the NCPD. (*Id.* at 550-54; 573.)

During the period between plaintiff's 2007 move to the basement cubicle and his termination in November 2009, pressure was mounting in the County government to cut costs. Particularly after the financial crisis in 2008, Suozzi was vigilant concerning each department's spending, including the NCPD. In Mulvey's view, "scrutiny on expenditures was really micromanaged and stressed," and he was under pressure to "trim the bureau." (*Id.* at 568.) However, 99% of jobs in the NCPD fell under the civil service regulations, making them difficult to eliminate. (*Id.* at 569-70.) As a result, the focus turned toward "ordinance positions" that were not civil-service protected, of which there were a limited number in the NCPD. (*Id.* at 474-75; 570.) Mulvey testified that there were five or six ordinance positions, but only two had significant enough salaries to be targets for budget-cutting. (*Id.* at 570-72.) One was the deputy commissioner, an attorney who handled Mulvey's contractual relations with the union and served as his "right hand man." (*Id.* at 571.) The other was plaintiff, and Mulvey believed that, because of his minimal duties, the elimination of plaintiff's position would have the least impact on the NCPD's operations. (*Id.* at 573.) Likewise, Ryan—who was the Deputy County Executive for Public Safety and responsible for recommending jobs to eliminate across the public safety agencies—testified that plaintiff's position could be "sacrificed" without compromising the police department's objectives. (*Id.* at 477.) For that reason, Mulvey recommended plaintiff's elimination to Ryan multiple times, who recommended the same to Suozzi as early as June 2009. (*Id.*) Ryan also did so more than once, but Suozzi did not act on the recommendations to fire plaintiff throughout the summer and early fall of 2009. (*Id.* at 477-78.)

Suozzi was a candidate for re-election in November 2009, when he ran against Mangano. (*Id.* at 221.) Although plaintiff had campaigned for Suozzi extensively in

the prior elections, he chose to support Mangano in 2009 because he felt that Suozzi had done nothing in response to plaintiff's complaints about his move to the basement cubicle. (*Id.*) Plaintiff had also been friendly with Mangano for 25 years. (*Id.* at 221-22.) Plaintiff told Yevoli and some other friends about his support for Mangano, and he began to attend events and raise funds. (*Id.* at 223-24.) Overall, plaintiff raised approximately $9,500 for Mangano. (*Id.* at 225.) At some point in the summer of 2009, plaintiff encountered Suozzi and told him that he was supporting Mangano; in response, Suozzi waved dismissively and walked away. (*Id.* at 259-60.) Plaintiff had known Suozzi for a number of years, and it appeared to plaintiff that Suozzi was angry. (*Id.* at 261.)

The 2009 election for Nassau County Executive was held on November 3, but the results were not immediately known because the election was too close to call. (*Id.* at 262.) Plaintiff was terminated on November 13, 2009, before the winner was determined. (*Id.* at 263, 270.) First, plaintiff received a call from Mulvey telling him that he was fired because of "downsizing." (*Id.* at 263.) Plaintiff immediately called Ryan and Suozzi, who claimed to be surprised. (*Id.* at 264.) Both men promised plaintiff that they would call him back, but neither ever did. (*Id.* at 268.)

Mulvey testified that plaintiff was fired on November 13 because Suozzi called Mulvey to tell him that he was under increased pressure with respect to the budget, and needed to eliminate a top position in the police department because of the perception that it was "top heavy." (*Id.* at 650, 651-54; 661.) As noted, Mulvey had recommended plaintiff's termination to Ryan and Suozzi several times before, and when Suozzi mentioned eliminating a top

position, Mulvey asked whether plaintiff was "on the table." (*Id.* at 653.) Suozzi confirmed that everyone was on the table, and Mulvey immediately recommended that plaintiff be fired. (*Id.*) Suozzi accepted the recommendation and told Mulvey to act on it. (*Id.* at 653; 661.)

Plaintiff testified that, when he learned of his firing, he pulled over his car and vomited. (*Id.* at 265.) He felt faint and dizzy, and was sweating profusely. (*Id.*) He called several people, including his wife, who began to cry. (*Id.* at 265-67.) Over the next four days, plaintiff called Suozzi 27 times, but he never answered. (*Id.* at 267.) In the following months, plaintiff felt humiliated and sick, and he had trouble sleeping and eating. (*Id.* at 277.) Plaintiff testified that he still holds a "terrible feeling" about the fact that, in his mind, his record reflects that he was ultimately fired from the police department he served for 30 years. (*Id.* at 278.)

In December 2009 or January 2010, after Mangano was announced the winner of the election, plaintiff met with him to discuss the discontinuance of his health care, which was supposed to be a lifetime benefit but was canceled after his termination (although it was ultimately restored). (*Id.* at 269-70.) Plaintiff also asked Mangano about getting his job back, but Mangano was non-committal. (*Id.*) At a later meeting after he took office, Mangano told plaintiff that he could not re-hire him because of pressure from the Nassau Interim Finance Authority and the county legislature to cut costs. (*Id.* at 275-76.) Mulvey was allowed to continue as Police Commissioner for a period of time after Mangano became County Executive in January 2010. (Tr. 577.)

## B. Procedural History

Plaintiff filed the complaint in this case on February 3, 2011, asserting a variety of claims of employment discrimination under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and the New York Human Rights Law (NYHRL). On January 10, 2013, the Court denied defendants' motion for summary judgment, and the parties submitted a proposed pretrial order on March 11, 2013. On July 11, 2013, the Court held a telephone conference with the parties and scheduled trial to begin on January 21, 2014.

On January 6, 2014, counsel for defendants requested an adjournment of the trial, explaining that the County had just hired them as outside counsel because of changes within the Office of the County Attorney, which had previously handled this case. Plaintiff opposed any adjournment, and the Court denied the request on January 7, 2014, because the case had been pending for nearly three years, the trial had been scheduled for nearly six months before the County chose to hire outside counsel, and there were no openings in the Court's calendar for at least the next six months.

On January 17, 2014, defendants filed a letter motion *in limine* in which they expressed their intention to assert the "policymaker" defense to plaintiff's First Amendment claim, which was premised on the allegation that plaintiff was fired in retaliation for supporting Mangano instead of Suozzi in the 2009 election. Defendants had not included that defense in the answer or in the pretrial order, and counsel from the Office of the County Attorney affirmatively abandoned it during the oral argument on the summary judgment motion in 2012. As an alternative to their argument that they should be allowed to assert the policymaker defense even though it was not in the answer, the defendants requested leave to amend their answer to include the defense. Plaintiff's counsel objected on the grounds that any amendment to the answer to include that defense would be highly prejudicial on the eve of trial. The Court reserved decision on the defendants' motion, but made clear that both sides should present evidence during the trial on the policymaker defense in the event the Court ultimately determined that there was no prejudice to plaintiff in allowing defendant to amend the answer and assert the defense.

A jury trial was held from January 23, 2014 until January 31, 2014. At the conclusion of the plaintiff's case, defendants renewed their request and filed a formal motion to amend the answer to include the policymaker defense. (ECF No. 60.) The Court then determined, in its discretion, that such an amendment should not be permitted because it would be overwhelmingly prejudicial to plaintiff to allow defendants to amend the answer just days before the trial, given plaintiff's inadequate time to investigate the defense, obtain discovery regarding the defense, and fully respond to the defense at trial. The Court also ruled, in the alternative, that defendants were given a full opportunity to present evidence on this defense at trial, and the proof at trial did not demonstrate that the policymaker defense should apply to plaintiff's position under the particular facts of this case. Thus, the Court also determined, based upon the defendants' evidence, that the defense failed on the merits. (Tr. 753-64.)

On January 31, 2014, the jury found in plaintiff's favor against the County on the § 1983 First Amendment claim. The jury awarded plaintiff $150,000 in compensatory

damages for emotional distress, after the parties agreed that back pay, reinstatement, and front pay were equitable remedies for the Court's decision. (Tr. at 806.) The Court instructed the parties to submit briefs concerning plaintiff's entitlement to those remedies, and also set a briefing schedule for defendants' motion for a new trial under Federal Rule of Civil Procedure 59, and its renewed motion under Rule 50 for judgment as a matter of law based on the policymaker defense.

Both parties filed their post-trial motions on March 4, 2014; their responses on April 2, 2014; and their replies on April 16, 2014. The Court held oral argument on May 2, 2014. Supplemental letters were filed after the oral argument.

## II. DISCUSSION

The discussion turns first to the County's renewed Rule 50 motion based on the policymaker defense, and its Rule 59 motion concerning the jury charge. Next, the Court considers plaintiff's motion for back pay, reinstatement, and front pay, and finally, the County's motion for a new trial on damages or remittitur of the $150,000 compensatory damages award.

### A. Policymaker Defense

The County's Rule 50 motion with respect to the policymaker defense was originally a motion to amend the answer to add an affirmative defense. The policymaker defense is an affirmative defense, *see Krause v. Buffalo & Erie Cnty. Workforce Dev. Consortium, Inc.*, 426 F. Supp. 2d 68, 103 (W.D.N.Y. 2005), and although it is referred to as the "policymaker defense" in this and other opinions, it involves a far broader inquiry than whether the individual asserting it "makes policy."

"[T]he focus should be not on the policymaking aspect of a plaintiff's employment, but rather on whether 'party affiliation is an appropriate requirement' for effective job performance." *Gordon v. Cnty. of Rockland*, 110 F.3d 886, 887 (2d Cir. 1997) (quoting *Branti v. Finkel*, 445 U.S. 507, 518 (1980)).

"A party must affirmatively state any . . . affirmative defense" in responding to a pleading. Fed. R. Civ. P. 8(c). If a party fails to assert an affirmative defense in its answer, a district court may still entertain it at a later stage of case "in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).

The Second Circuit has provided guidance to the district courts on how to measure prejudice in a particular case:

> In gauging prejudice, we consider, among other factors, whether an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute. Undue prejudice arises when an amendment [comes] on the eve of trial and would result in new problems of proof.

*Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (quotations and citations omitted). The Second Circuit also has emphasized that "[w]hen the moving party

has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave, a court may exercise its discretion more exactingly." *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990).

As set forth in a detailed ruling on the record, the Court determined the County had numerous opportunities to assert the policymaker defense over the course of the litigation and failed to do so, without any explanation. Moreover, the Court held that the County's late assertion of the defense on the eve of trial would prejudice the plaintiff. In the alternative, the Court held, on the merits, that the County had not carried its burden to show that plaintiff was a policymaker within the meaning of that defense.[3] This Memorandum and Order supplements the Court's oral ruling on these issues.

### i. Denial of Motion to Amend

Plaintiff argued that the policymaker defense was waived because the County did not assert it in the answer, at summary judgment, or in the pretrial order, and also represented during oral argument on the summary judgment motion that no such defense was being asserted. Moreover, plaintiff argued that he would be greatly prejudiced by an amendment to the answer on the eve of trial to include that defense. As set forth below (and in detail on the record), the Court concluded that amendment of the answer to allow such a defense on the eve of trial would have been overwhelmingly prejudicial to plaintiff and, thus, the motion was properly denied.[4]

Permitting the late assertion of the policymaker defense here would cause substantial prejudice to plaintiff, because the County raised it for the first time in a letter dated January 17, 2014, just four days before trial began on January 21, 2014. Although the County argues that it raised the issue in a 2012 letter requesting leave to move for summary judgment, the summary judgment brief did not argue the policymaker defense, and at the subsequent oral argument, then-counsel for the County affirmatively abandoned it when she told the Court that "political party isn't an issue." After counsel's statement, the record is devoid of any reference to the policymaker defense until the County asserted it in the motion *in limine* just four days before trial. Notably, the defense was not included among the six affirmative defenses listed in the pretrial order on March 11, 2013, nor was any notice of the defense provided to the Court or plaintiff's counsel in the many months between the filing of the pretrial order in March 2013 and the eve of the trial in January 2014.

At trial, because the Court reserved on the motion to amend, the Court allowed each side to introduce evidence on the policymaker defense, after which the overwhelming prejudice to plaintiff was

---

[3] As noted *supra*, the Court reserved on the motion to amend the answer and allowed the County (and plaintiff) to present its policymaker evidence at the trial (so the Court could determine the level of prejudice to plaintiff in terms of his ability to respond). Thus, the County presented all its evidence on this issue and the Court concludes that, even on the County's evidence, the policymaker defense fails as a matter of law.

[4] Moreover, the Court concludes, in the alternative, that the defense was waived based upon, *inter alia*, the failure to assert the defense in the answer and the statement at oral argument by the County disavowing that defense. As this Court noted in its oral ruling, "[i]f that is not abandoning a defense, I don't know what is." (Tr. 756.)

abundantly clear to the Court. (*See* Tr. 755 (denying motion to amend because "I concluded, having presided over this trial, that there is overwhelming prejudice [to plaintiff]. The way this developed, in my view, was fundamentally unfair to the plaintiff."); *see also* Tr. 757 ("In terms of what prejudice there was, again, I watched this trial, and I was shocked at how this was being attempted to prove, with documents that were not part of either the discovery process or certainly not part of the pretrial order, and witnesses, like Mr. Ryan and Mr. Yevoli, who there was no notice. Mr. Ryan is not even in the pretrial order.")). In particular, the Court noted that plaintiff was effectively "bushwhacked" by documents and witnesses related to the policymaker defense which were not part of discovery. (*Id.* at 759.)

The policymaker defense is not simple to litigate—it is analyzed under a list of eight non-exhaustive factors which vary in application in each case. *See Gordon*, 110 F.3d at 889. Here, most of those factors were disputed and would have required additional discovery and witnesses for either side to litigate them thoroughly. Attempting to do so on just four days' notice would have caused obvious prejudice to plaintiff. Plaintiff's counsel explained to the Court in detail what discovery he would have needed to properly defend against this defense (Tr. 736-41), and the Court concluded that the absence of such discovery was highly prejudicial to plaintiff.

Other courts, in similar circumstances, have also not allowed such an amendment to proceed. For example, in *Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997), the Seventh Circuit held that the defendant should not be permitted to belatedly raise (for the first time in a reply memorandum on a summary judgment motion) a statute of limitations defense. Although the court decided the issue based upon waiver, the analysis of the prejudice to plaintiff of the assertion of the late defense is similar to the prejudice that this Court views exists in the instant case. The Seventh Circuit explained:

> By omitting mention of the statute of limitations until they filed their reply memorandum, the defendants deprived [plaintiff] of any reasonable opportunity to address that defense. At that juncture, the parties had largely completed an exhaustive discovery process, and the scheduled trial date was only a month away.... When the district court subsequently relied on the statute of limitations in granting defendants summary judgment on the free speech claim, it did not consider the evident prejudice to [plaintiff] in doing so. We cannot overlook the failure to comply with Rule 8(c) in this context. Intentionally or not, [plaintiff] was bushwhacked. We recognize that the limitations defense may have been meritorious; and [plaintiff's] counsel should have had some inkling that the defense *might* be raised given the date that her own allegations placed on the events central to her free speech claim. But it was not [plaintiff's] obligation to raise the defense, and if Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff.

*Id.* at 968-69 (citations omitted); *see also Parker v. Madison Cnty. Reg'l Office of Ed.*, No. 10-132-DRH, 2012 WL 1964966, at *6 (S.D. Ill. May 31, 2012) (denying leave to amend answer to add certain affirmative

defenses that had not been raised to that point "because allowing them to be raised at this stage of the litigation would be highly prejudicial to plaintiff.").

Therefore, for the reasons set forth on the record and here, the Court denied the motion to amend the answer, and denies the renewed Rule 50 motion, with respect to the policymaker defense.

### ii. Applicability of the Policymaker Defense to Plaintiff's Position

In the alternative, even assuming *arguendo* that the Court reached the merits of the policymaker defense, based upon the evidence defendants presented to the Court on that issue, the Court concludes that the defense fails as a matter of law because the County did not show that plaintiff—in his reconstituted position after Mulvey became police commissioner—was a policymaker for whom "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518.

The Second Circuit has stated that, "[u]ltimately, whether an employee's position falls within the *Elrod-Branti* policymaker exception is a question of law for the court." *Almonte v. Cnty. of Long Beach*, 478 F.3d 100, 110 (2d Cir. 2007). However, the question does require "some preliminary factual inquiry," *id.*, especially where, as here, a general job description does not conclusively determine whether the plaintiff is a policymaker. *See Morin v. Tomey*, 626 F.3d 40, 45 n.5 (2d Cir. 2010). For this reason, the Court allowed the parties to introduce evidence at trial concerning the job of Assistant Commissioner, and ultimately concluded that there was little or no factual dispute concerning its lack of a formal description or inherent powers. (*See*

Tr. at 764.) Nonetheless, in an abundance of caution, the Court has considered the evidence concerning plaintiff's employment in a light most favorable to the defense. (*Id.*)

"For a court to find that 'political affiliation is an appropriate requirement' of a specific job, there must be a 'rational connection between shared ideology and job performance.'" *Cicchetti v. Davis*, 607 F. Supp. 2d 575, 578 (S.D.N.Y. 2009) (quoting *Savage v. Gorski,* 850 F.2d 64, 68 (2d Cir. 1988)). Courts in this circuit considering whether there is such a rational connection have applied the factors described in *Vezzetti v. Pellegrini*, which include whether the employee:

(1) is exempt from civil service protection,
(2) has technical competence or expertise,
(3) controls others,
(4) is authorized to speak in the name of policymakers,
(5) is perceived as a policymaker by the public,
(6) influences government programs,
(7) has contact with elected officials, and
(8) is responsive to partisan politics and political leaders.

*See* 22 F.3d 483, 486 (2d Cir. 1994).

The *Vezzetti* factors "should be applied to the formal description of the job at issue, that is, to the inherent powers of the position, rather than the duties actually performed by plaintiff." *Cicchetii*, 607 F. Supp. 2d at 578. That distinction is particularly important in this case because plaintiff's job as Assistant Commissioner changed over time, and it lacked a formal description or inherent powers. The most

that was proven about the position is that it lacks civil service protection. (Tr. at 570-72.) Although this is a significant factor, the Court disagrees with the County's argument that it is the determinative factor. *See Gordon*, 110 F.3d at 890 n.5 ("This circuit does not, however, presume employees are exempt from First Amendment protection just because they are exempt from civil service protection."). In this particular factual context, *see Ciccetti*, 607 F. Supp. 2d at 579 (describing the inquiry as "fact intensive"), the lack of civil service protection does not persuade the Court that party loyalty was an appropriate requirement for being Assistant Commissioner because the County has not shown what the requirements of that job actually were. The minimal evidence concerning other Assistant Commissioners did not establish a common set of duties and powers, and in plaintiff's case, he was stripped of authority, moved from inside of police headquarters to the basement cubicle, and left only with management of the STARCOM task force, a new duty with an unclear amount of responsibility. (*See* Tr. at 202 ("Q: What were your responsibilities as they related to STARCOM? A: Under Commissioner Lawrence, to coordinate, facilitate with them. . . . Q: What about under Commissioner Mulvey? A: There was no function for me to perform."); 685 ("[Mulvey] did not put him in as a decision-maker at all. [Mulvey] limited his role").) In other words, the evidence at trial showed that plaintiff's job was reconstituted and stripped of its authority over time, such that it did not resemble the job of any other Assistant Commissioner, and it is therefore impossible to apply the *Vezzetti* factors to a formal description of plaintiff's job. (*See id.* at 762 ("There was no articulated description of what [plaintiff's] job would be, other than that he continued to be involved in STARCOM.").)

Even applying the *Vezzetti* factors to plaintiff's job as he performed it, the Court does not conclude that party loyalty was an appropriate job requirement. At most, plaintiff had technical competence and limited authority with respect to STARCOM, which was further reduced under Mulvey. (*Id.* at 202-03; 622-23 (describing plaintiff's authority with respect to STARCOM as indirect, with the ability to organize meetings but not compel attendance).) Although plaintiff had personal contact with Suozzi, an elected official, there is no evidence that plaintiff was a close advisor while he was Assistant Commissioner, or that his job functions were responsive to Suozzi's political leanings or partisan agenda. None of the witnesses testified that there was a perception of plaintiff as a policymaker, and he did not control any other employees. (*Id.* at 537 ("[Mulvey did] not want him to be involved in the capacity where he would be ordering people around, that he be attending [Mulvey's] critical staff meeting and that kind of thing."); 620-21 (describing plaintiff's lack of "line authority")).)

Therefore, with respect to the "principle of primary importance: whether the employee in question is empowered to act and speak on behalf of a policymaker," *Gordon*, 110 F.3d at 890, the County has not carried its burden. *Cf. Butler v. N.Y. State Dept. of Law*, 211 F.3d 739, 744 (2d Cir. 2000) (finding that deputy Attorney General was a policymaker where she supervised 80 other attorneys and routinely acted and spoke on behalf of the elected Attorney General); *Burkhardt v. Lindsay*, 811 F. Supp. 2d 632, 646 (E.D.N.Y. 2011) (concluding that legislative aide was a policymaker because "the record . . . supports a finding that legislative aides may be empowered to act and speak on behalf of a policymaker or elected official."); *Alberti*

*v. Cnty. of Nassau*, 393 F. Supp. 2d 151, 168-72 (E.D.N.Y. 2005) (concluding that officials were policymakers when they represented county before legislature, had meaningful input on budget, were required to "make sure that whatever the commissioner wanted was done," had authority to approve budget requests, and channeled communications among senior officials). Accordingly, in the alternative, the Court concludes (for the reasons set forth in the record and in this Memorandum and Order) that the policymaker defense fails on the merits under the particular facts of this case, and the renewed Rule 50 motion is denied on that ground.[5]

_____

[5] To the extent the County suggests that this ruling has some precedential value for assistant police commissioners or similar officials across county governments, the Court completely disagrees. Instead, the Court emphasizes that its decision is based upon the unique facts of this case where plaintiff's Assistant Police Commissioner position was clearly reconstituted and *the new position*, which had no responsibilities on paper, and virtually none in practice, simply could not support the conclusion that there was a rational connection between shared ideology and job performance. In other words, ideology was completely irrelevant to the ill-defined job duties of the reconstituted position. (*See* Court's Oral Ruling at Tr. 762-63 ("So if you go through all of the factors at that point in the job, no contact with Mr. Suozzi . . . other than obviously complaining, and his personal relationship with Mr. Suozzi, -- but in terms of the function of his job and giving advice to Mr. Suozzi with respect to police matters or emergency matters, there is nothing in the record, zero, zero testimony in the record from any witness, defense witness. And Mr. Monette testified that there was no such contact at that point in terms of the function of his job. So he's not involved in advising the county executive at that point, He has no function other than running STARCOM. He's not influencing government programs. He's not supervising anybody. He's not controlling others. He's providing no special expertise on any policy issues. Every other factor in the analysis would indicate that shared ideology or political affiliation was completely irrelevant for the position as it was reconstituted.").) Therefore, the Court's ruling—that the County had not met its

## B. Jury Charge

The County also seeks a new trial under Federal Rule of Civil Procedure 59, arguing that the Court erred in its instruction with respect to the "motivating factor" element of the First Amendment retaliation claim.

In order to prove a First Amendment retaliation claim, a plaintiff must demonstrate "(1) [he] engaged in constitutionally protected speech because [he] spoke as [a] citizen on a matter of public concern; (2) [he] suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006) (citation omitted), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008). The focus of the Rule 59 motion is the jury instruction with respect to the third element.

In the context of a First Amendment retaliation claim, as the Supreme Court has explained, "the burden [is] properly placed upon [the plaintiff] to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the [employer's] decision [regarding plaintiff's employment]. [The plaintiff] having carried that burden, however, the District Court should have gone on to determine whether the [employer] had shown by a preponderance of the evidence that it would have reached the same decision as to [the plaintiff's] employment even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977).

_____

burden under the *Vezzetti* factors, is limited to the unique, completely reconfigured position in this case.

The County did not contest at trial, and does not contest now, the utilization of the *Mt. Healthy* burden-shifting framework in the jury instructions for the First Amendment retaliation claim.[6] Instead, the County challenges the particular "motivating factor" instruction that the Court gave to the jury. Specifically, the County argues that the Court committed prejudicial error when it instructed the jury that it must find that "plaintiff's political association was a motivating factor in the decision by [defendants]," and then defined "motivating factor" as follows:

> The plaintiff's political association was a motivating factor in the defendant's decision to take adverse action if it played a role in the decision. However, plaintiff's political association need not be the only factor. Mr. Mulvey or Mr. Suozzi may have taken action for many reasons. But if one of those reasons was plaintiff's political association, and if that reason played a role in the decision by Suozzi or Mulvey to take action against the plaintiff, then plaintiff has satisfied the third element.

(Tr. at 950.) The phrase "played a role" is the focus of defendants' motion, in that they argue that "played a role" minimizes plaintiff's burden in the absence of a qualifying word such as "important," "substantial," or "determinative." This argument is based largely on the Supreme Court's decision in *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993), which did not address jury instructions, but which the Second Circuit cited in the jury-instruction case relied on by this Court at trial, *Owen v. Thermatool Corp.,* 155 F.3d 137, 139 n.1 (2d Cir. 1998). (*See* Tr. at 802-05.)

The passage from *Hazen Paper* cited in *Owen* is a summary of the law of disparate treatment, not a holding about the contents of jury instructions: "[w]hatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually *played a role* in that process and had a determinative influence on the outcome." *Id.* at 610 (emphasis added). In *Owen*, the Second Circuit cited this passage while "emphasiz[ing] that the particular words used in a jury instruction may (depending on the circumstances) be less important than the meaning or substance of the charge as a whole." 155 F.3d at 139 n.1. The *Owen* Court then instructed that:

> What is important is that the charge conveys the idea that (1) the impermissible factor (in ADEA cases, age) must have *played a role* in the employer's decision, *see Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *Price Waterhouse*, 490 U.S. at 250 (plurality opinion), and (2) the factor need not have been the sole consideration motivating the employer's decision.

---

[6] Courts, including the Second Circuit, have continued to utilize this burden-shifting framework in First Amendment retaliation cases even subsequent to the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), with respect to the ADEA. *See, e.g., Anemone v. Metro. Trans. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011); *see also Greene v. Doruff*, 660 F.3d 975 (7th Cir. 2011) (holding that *Gross* does not affect First Amendment cases and the *Mt. Healthy* standard continues to apply to such suits) (collecting cases). As noted herein, although the ADEA standard has now changed as a result of *Gross*, the Court has cited several pre-*Gross* cases because they provide useful guidance as to the "motivating factor" standard, which remains applicable in the context of First Amendment retaliation cases, as to the plaintiff's initial burden.

*Id.* (emphasis added). Here, the Court followed the Second Circuit by using the exact same phrase as *Owen*, *i.e.*, "played a role," without the additional language from *Hazen Paper* concerning "a determinative influence," which the Second Circuit also omitted from its statement in *Owen* of "[w]hat is important" in a jury charge.[7]

The County points to other cases where courts have used words like "substantial" to define the *degree* to which unlawful discrimination must have "played a role," but the word "motivating" itself defines the degree, without the need for further explanation. In its proposed charge, the County sought to have the Court instruct that motivating factor means that political affiliation "played a substantial or important part in the decision." (Docket No. 53, at 19.). In its post-trial motion, the County notes that this Court's initial draft charge contained this language, which mirrors the language in Judge Sand's *Modern Federal Jury Instructions*. The County then suggests that "[t]he Court inexplicably altered Judge Sand's instructions and imposed a lessened burden of proof upon Plaintiff in its final version of the charge." (Def.'s Post-Trial Memorandum, at 10-11.)

However, what the County fails to note is that the modification in the language was only made after the Court conducted additional research (when plaintiff's counsel raised an objection) and determined that the Second Circuit in *Owens* had not only determined that "substantial" and "motivating" are "reasonably interchangeable or at least have considerable overlap,"[8] but also suggested that the term "motivating" was "perhaps more precise" than "substantial." 155 F.3d at 139. In particular, in *Owens*, the plaintiff challenged the use of term "substantial" in the instruction because it could suggest that the prohibited reason had to be the only reason or primary reason. Although finding that the instruction adequately informed the jury, the Second Circuit clearly expressed a preference for the term "motivating" over "substantial":

> In the circumstances presented, the district court's use of the phrase "substantial factor" rather than "motivating factor" was not misleading and adequately informed the jury of the law. The words "substantial" and "motivating" are reasonably interchangeable or at least have considerable overlap. *While the phrase "motivating factor" is perhaps a more precise and more typical statement of the*

[7] Although not in the context of jury instructions, the Second Circuit has repeated the "played a role" language in analyzing discrimination claims. *See, e.g., Lamprox v. Banco Do Brasil*, 538 F. Appx. 113 (2d Cir. 2013) ("[W]e find no evidence in the record that would allow a reasonable juror to conclude that either Lampros's national origin as a non-Italian or his previously bringing Pais's complaint of national origin discrimination to Monteiro's attention played a role in BdB's decision to terminate his employment."); *Jamlik v. Yale Univ.*, 362 F. Appx. 148, 150 (2d Cir. 2009) ("Yale's explanations for the pay disparity are not inconsistent, and Jamilik does not present any other evidence to suggest that gender discrimination played a role in the adverse employment decision in question, as required to establish a prima facie case under Title VII.").

[8] In describing the law (rather than jury instructions) in First Amendment retaliation cases, the Second Circuit also appears to use these terms interchangeably, sometimes referring to a "substantial or motivating factor," *Royal Crown Day Care LLC v. Dep't of Health and Mental Hygiene of City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) (quotations and citations omitted), or sometimes simply referring only to a "motivating factor" (without the term "substantial"), *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003) (quotations and citations omitted).

*standard* for liability in ADEA cases, the trial court's use of "substantial factor" adequately stated the law in this case.

*Id.* at 139 (emphasis added) (citations omitted).

In short, this Court's decision with respect to the language in the instruction was to utilize verbatim what the Second Circuit stated in *Owen* was important to convey about the term "motivating factor" – namely, that the impermissible factor "must have played a role in the employer's decision" – without adding other less precise adjectives, such as "substantial" or "important," which could only potentially mislead the jury into believing that the impermissible factor had to be the sole or primary reason for the action. Similarly, the County's fallback position during the trial – that is, that "motivating factor" should be defined as "a motivating role" (Tr. at 805) – was rejected by the Court because "played a role in the decision" better defined the term "motivating factor" (as was more consistent with *Owen*) than simply defining a "motivating factor" as a "motivating role," the circularity of which is obvious.

Although the County never requested in its proposed jury instruction that this Court use the phrase "determinative influence," the County now suggests in its post-trial brief that the Court should have utilized that phrase.[9] However, the Second Circuit has noted that it has "consistently held that a plaintiff in an employment discrimination case need not prove that discrimination was the sole motivating factor, the primary motivating factor, or the real motivating factor in the adverse employment action; she need only prove that discrimination was a motivating factor." *Olson v. New York*, 315 F. App'x 361, 363 (2d Cir. 2009). The *Olson* court then quoted the statement from *Owen* regarding what is important to include in a jury instruction, which again uses the phrase "played a role" and has no reference to the phrase "determinative influence." *Id.* In fact, the *Olson* court was concerned that, when a court simply used "because of" language rather than the term "motivating factor" language to describe plaintiff's burden, "use of the phrase 'because of' without explanation could have been confusing to the jury, as it could have suggested to the jury that it could find for plaintiff only if he proved that discrimination was the sole or primary reason he was fired." *Id.* Thus, like *Owen*, the *Olson* court makes clear that district courts should avoid adding adjectives or phrases which might suggest that "motivating factor" means it was the sole or primary reason for the adverse action. In this Court's view, a lay person could easily misunderstand the term "determinative influence" to mean plaintiff has the initial burden of proving retaliation was a "but for" cause.[10] However, as both sides agree, in

---

[9] During the charge conference, the County argued that the Court should add the word "substantial" (so that it would read "substantial and motivating factor"), or use the word "motivating" a second time (so that a "motivating factor" would be defined as a "motivating role"). (Tr. 802-05.) The term "determinative influence" was not part of the County's written proposed charge, and was never suggested in the charge conference.

[10] In fact, in *Ostrowski v. Atlantic Mut. Ins. Co.*, 968 F.2d 171, 176 (2d Cir. 1992), the district court equated "determinative" and "but for" by stating: "[i]n order for the age discrimination issue to be a determinative factor, it has to be a factor but for which the plaintiff would have been fired. In order for it to be a determinative factor, you must find really that if it had not been for this, he would not have been fired." The Second Circuit held that the Court's instruction impermissibly transformed a "mixed motive" case into a "pretext" case. *Id.* at 185

15

First Amendment retaliation cases, plaintiff has the burden of proving only that retaliation was motivating factor, and then the burden shifts to the defendant to show that the adverse action would have occurred anyway – and, thus, was not the "but for" cause. *See, e.g. Greene*, 660 F.3d at 978-79 ("A 'motivating factor,' as the term is used in the cases, is a sufficient condition, but never a necessary one; if it were necessary, and thus a 'but for' cause (as in 'but for X, Y would not have occurred': X is a necessary condition of Y), the inquiry into causation would be at an end. . . . If the plaintiff satisfies his burden of proving a 'motivating factor' in the sense just defined (which we think is what the cases mean by the term), the defendant is entitled to rebut with evidence that the plaintiff's exercise of his constitutional rights though a sufficient condition was not a necessary condition of his being rehired; the harm (the refusal to rehire) would have occurred anyway."). In other words, the "determinative influence" language in *Hazen* could have confused the jury with respect to the plaintiff's initial burden under the *Mt. Healthy* standard for First Amendment retaliation claims, or led them to believe that the factor had to be the sole or primary factor.

This issue was discussed by Judge Stein in *Courtney v. City of New York*, 20 F. Supp.

---

("These formulations, together with the emphasis on the term 'determinative' factor, and the trial court's view expressed in the robing room that there can be no such thing as 'a little bit of retaliation or a substantial amount of retaliation,' indicate that the court treated the present matter as simply a pretext case. As *Price Waterhouse* pointed out, a pretext case is one in which there was either unlawful motivation or lawful motivation, but not both; a mixed-motives case is one in which there were both lawful and unlawful motivations. We reject the district court's view that a claim of retaliation necessarily presents only a pretext case and cannot be a mixed-motives case.") (citations omitted).

2d 655 (S.D.N.Y. 1998), which was a pre-*Gross* ADEA case that involved a "mixed motive" instruction. In rejecting the City's argument that the Court should have used the term "determinative factor" rather than "motivating factor," the court explained:

> This instruction was well within the parameters established by the Second Circuit. For example, in *Renz v. Grey Advertising, Inc.*, 135 F.3d 217, 222 (2d Cir. 1997), the court wrote that an ADEA plaintiff is entitled to prevail if she demonstrates that her age played a "motivating role in, or contributed to, the employer's decision." The court also noted that in a mixed motive case, such as this one, an "adverse employment action creates liability when discrimination substantially motivates the action, even though some legitimate factor might also contribute to the employer's decision." *Id*. at 222 n.3. The Second Circuit held specifically that "an ADEA plaintiff need not prove that age was the only or even the principal reason for the complained-of employment action." *Id*. at 222. Given this holding, defendant's reliance on a "but for" analysis and its contention that plaintiffs had to prove that age was "determinative" must be rejected.

*Id*. at 659-60 (footnote omitted) (citations omitted).

Similarly, in *Zaken v. Boerer*, 964 F.2d 1319, 1324-25 (2d Cir. 1992), which involved a claim of pregnancy discrimination, the Second Circuit held that the district court erred in defining motivating role as "what prompts a person to act." The Court explained that "[t]he trial court's definition of motivating role as 'what

prompts a person to act' was wrong insofar as it failed to explain to the jury that plaintiff need not show pregnancy was the primary reason for defendant's decision to discharge plaintiff and deny her a bonus, but only that it was a factor relied upon by defendant." *Id*. at 1325. The Court then suggested what the instruction should have been:

> In short, the jury should have been instructed that if it found plaintiff had demonstrated by a preponderance of the evidence that her pregnancy *played a part in defendant's decision*, then it should find for plaintiff unless defendant demonstrated by a preponderance of the evidence that the same decision would have been made even if pregnancy had not been one of the factors contributing to it.

*Id*. (emphasis added).

Although the County attempts to parse the Court's "motivating factor" instruction to suggest that it eliminated the legal requirement the impermissible factor had to motivate the decision, the Court's instruction did no such thing. Moreover, the jury charge must be reviewed in its entirety, not in isolation. *United States v. Shamsideen*, 511 F.3d 340, 345 (2d Cir. 2008). Here, regardless of what particular words or adjectives that the County would have preferred in the instruction (and which would have only confused the jury and potentially misled the jury into a heightened burden), there can be no doubt from the charge as a whole that the jury understood that plaintiff had to prove that his political association was a motivating, or contributing, factor in his termination. For example, (1) the jury was instructed that plaintiff's claim was that "the County of Nassau, through Mr. Suozzi and Mr. Mulvey, intentionally discriminated against him by retaliating against him *on the basis of* his political association in violation of his constitutional rights under the First Amendment" (Tr. 948) (emphasis added); (2) the jury was instructed that "the First Amendment prohibits an official from discriminating or retaliating against public employees simply *because* the public employee exercises his First Amendment right to form political associations with which the official may disagree" (Tr. 948-49) (emphasis added); (3) the jury was instructed that plaintiff must prove that "plaintiff's political association was *a motivating factor* in the decision by Mr. Mulvey or Mr. Suozzi to take adverse action against the plaintiff" (Tr. 949) (emphasis added); (4) the jury was further instructed that "plaintiff's political association was *a motivating factor* in the defendant's decision to take adverse action if it *played a role in the decision*" (Tr. 950) (emphasis added); (5) the jury was also instructed that "if *one of those reasons* was plaintiff's political association, and *if that reason played a role in the decision* by Suozzi or Mulvey to take action against the plaintiff, then plaintiff has satisfied the third element" (Tr. 950) (emphasis added). Finally, the verdict sheet once again highlighted the need for the impermissible factor to have motivated the decision by asking the question in this manner: "Did plaintiff prove, by a preponderance of the evidence, his claim that the County of Nassau terminated him *based on* his political association, in violation of plaintiff's rights under the First Amendment?" (ECF No. 76, at 2) (emphasis added). The jury answered, "Yes." Then the jury, with respect to the affirmative defense under *Mt. Healthy*, was asked: "Did the County of Nassau prove, by a preponderance of the evidence, that it would have terminated plaintiff on the same day even if his political association had

never changed?" (*Id.*) As to the question, the jury answered, "No."

In short, the Court' language as a whole, with the references to "motivating factor," as well as the verdict sheet itself, properly defined the degree of influence required for a finding of liability, in the same language used by the Second Circuit in *Owen* and other cases.

Accordingly, because there was no error in the instruction, the County's Rule 59 motion is denied.

## C. Back Pay

At trial, both sides agreed that the award of back pay is an equitable remedy for the Court's consideration, and the Court requested briefing on the question whether to award back pay, and how much. (Tr. at 806, 973-78.) Plaintiff argues that he is entitled to an award of back pay from the date of his unlawful termination on November 13, 2009, until the date of judgment in 2014, while defendants argue that any back pay award should run only until the change of administration on January 1, 2010, because plaintiff would not have been retained in the Mangano administration.

There is a lack of directly analogous authority with respect to the circumstances of this case. In particular, neither party nor the Court has identified a case addressing who carries the burden, and to what extent, of proving entitlement to back pay in an employment discrimination action brought under § 1983, as opposed to the other federal employment discrimination statutes, under which the burdens are more clearly defined. Here, each party argues that the other was required to prove how long plaintiff would have remained as an

Assistant Commissioner, had he not been fired on November 13, 2009.

In the absence of directly controlling authority, the Court turns first to the common law of torts, which is the baseline for determining damage awards in § 1983 cases. *See Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986). However, "the common law is not an infallible guide for the development of § 1983." *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 232 (1970) (Brennan, J., concurring in part and dissenting in part)). In *Townes*, the Second Circuit noted that common-law tort rules may conflict with the principles inherent in § 1983. *Id.* That is because the primary purpose of § 1983 "is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254-57 (1978)). "In cases where common law and § 1983 principles conflict, 'the task will be the more difficult one of adapting common-law rules of damages to provide fair compensation for injuries caused by the deprivation of a constitutional right.'" *Townes*, 176 F.3d at 148 (quoting *Carey*, 435 U.S. at 258).

The Court's duty to reconcile the common law with the remedial purpose of § 1983 is of particular importance with respect to back pay, an equitable remedy[11]

---

[11] Although it has not been frequently discussed in opinions by the courts of this circuit, the Court shares the view of other courts that a back pay award under § 1983 is equitable. *See Morgenstern v. Cnty. of Nassau*, No. CV 04-58 (ARL), 2009 WL 5103158, at *4-6 (E.D.N.Y. Dec. 15, 2009) (noting the equitable nature of back pay under § 1983); *Wylucki v.*

about which the Court has "traditional discretion to locate 'a just result' in light of the circumstances peculiar to the case." *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 424 (1975) (citation omitted). The award of back pay should be as complete as possible, *Cohen v. West Haven Bd. of Police Comm'rs*, 638 F.2d 496, 504 (2d Cir. 1980), but "'it remains a cardinal, albeit frequently unarticulated assumption, that a back pay remedy must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practices.'" *E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 124 (2d Cir. 1998) (quoting *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 900 (1984)). "The purpose of a back pay award is . . . not to punish an employer or provide a windfall to the employee." *Meling v. St. Francis Coll.*, 3 F. Supp. 2d 267, 275 (E.D.N.Y. 1998) (internal citations omitted).

In many cases, courts attempting to locate a just result have awarded what

plaintiff seeks here: back pay from the date of injury to the date of judgment. Under Title VII, that has been called the "ordinary rule," *Joint Apprenticeship Comm.*, 186 F.3d at 124, and such awards are also common in ADEA cases. *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 167 (2d Cir. 1998) ("A plaintiff who has proven a discharge in violation of the ADEA is, as a general matter, entitled to backpay from the date of discharge until the date of judgment."). However, even in these analogous statutory contexts, "[b]ecause the termination date for backpay awards . . . is peculiarly dependent upon each case's unique facts . . . courts do not apply the backpay limitation rotely." *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 302 (S.D.N.Y. 2008) (quoting *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 n.4 (9th Cir. 1986)). On the contrary, the Supreme Court has emphasized that courts sitting in equity should avoid "mechanical rules" and maintain "awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case." *Holland v. Florida*, 560 U.S. 631, 650 (2010).

The specific circumstances of this case are different than those found in the Title VII and ADEA cases in which back pay awards ran to the date of judgment. Those cases tend to involve plaintiffs in predictably long-term jobs, where it is clear that an award of back pay should roughly equal the salary that the plaintiff would have earned absent the unlawful firing. *See, e.g.*, *Joint Apprenticeship Comm.*, 186 F.3d at 114 (union applicants); *Cohen*, 638 F.3d at 498 (police recruits). Here, in contrast, plaintiff was already retired when he took the job as Assistant Commissioner, which he received after heavy campaigning for Suozzi. (Tr. at 125-36.) There is no evidence which makes the Assistant Commissioner position analogous to a long-term corporate or union

---

*Barberio*, No. 99-CV-1036SR, 2001 WL 34013676, at *6 (W.D.N.Y. 2001) (discussing courts' "discretionary authority to fashion equitable remedies for a violation of 42 U.S.C. § 1983"); *Flores v. Local 25, Int'l Bd. of Elec. Workers, AFL-CIO*, 407 F. Supp. 218, 220-21 (E.D.N.Y. 1976) (considering back pay to be an equitable remedy under 42 U.S.C. § 1981); *see also Russell v. Northrop Grumman Corp.*, 921 F. Supp. 143, 151-53 (E.D.N.Y. 1996) (discussing considerations involved in determining whether claims for lost wages are legal or equitable in nature). Moreover, the Court does not detect any tension between the equitable nature of a back pay award under § 1983 and statements in *Carey* and other cases concerning the compensatory nature of damages under that statute. "[T]he fact that cases in many contexts attach the 'equitable' label to back pay in no way contradicts the basic conclusion that back pay is still essentially a compensatory device. In fact, many of the same courts that classify back pay as equitable in one part of an opinion affirm its compensatory nature in the next." *Hubbard v. Adm'r, E.P.A.*, 982 F.2d 531, 537 (D.C. Cir. 1992).

job—in contrast, many previous Assistant Commissioners had been volunteers given the position in an honorary status. (*See id.* at 530.) Although plaintiff was salaried, his future in the position was highly precarious at the time he was fired. To begin with, Mulvey wanted to terminate plaintiff as soon as he became Commissioner in 2007 because he believed that plaintiff lacked integrity (*id.* at 518), and plaintiff was protected from termination only by Suozzi, who limited plaintiff's duties and isolated him from the police department in order to appease Mulvey (*id.* at 535-38). Moreover, the pressure to terminate plaintiff's position mounted throughout 2009 for purely non-discriminatory reasons: he was an ordinance employee with minimal duties in a department perceived to be "top heavy," and his name repeatedly appeared on a list of positions that could be terminated without compromising the police mission. (*Id.* at 474-77; 650-54.) Ryan and Mulvey specifically recommended plaintiff for termination several times, and although Suozzi chose not to act on the recommendation before November 2009, there is overwhelming evidence that plaintiff's employment would not have continued in Suozzi's absence.

When such a question arises with respect to a back pay award, courts have varied in their approach to the assignment of the burden of proof, and the parties dispute it here. Plaintiff argues that the "ordinary rule" of back pay through the date of judgment applicable in other employment discrimination contexts applies presumptively here, and that defendants bear the burden to prove that it should not. Defendants argue that plaintiff bore the burden to prove his damages to a degree of reasonable certainty. *See Wallace v. Suffolk Cnty. Police Dep't*, 809 F. Supp. 2d 73, 81 (E.D.N.Y. 2011).

As noted above, neither the party nor the Court has identified a directly analogous case discussing the burden of proof. In another First Amendment employment discrimination case, the Second Circuit seemed to suggest that the defendant bore the burden of limiting back pay damages based upon evidence that it would have fired the plaintiff for a lawful reason at some time after the unlawful firing. *Sagendorf-Teal v. Cnty. of Rensselaer*, 100 F.3d 270, 274 (2d Cir. 1996) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989) and *McKennon v. Nashville Banner Publ'g Co.,* 513 U.S. 352 (1995)). However, *Sagendorf-Teal* primarily addressed liability, not damages, and its comment about back pay was dicta.

In an opinion just three years later that did address back pay, the Second Circuit held that a plaintiff should have been permitted to argue to the jury that she would have survived a reduction in force which occurred after her unlawful firing. *See Banks v. Travelers Cos.*, 180 F.3d 358, 361-63 (2d Cir. 1999). In *Banks*, the trial judge ruled as a matter of law that the plaintiff was ineligible for damages after the reduction in force, and thus the Second Circuit's opinion concerned the propriety of that ruling, not the question of which party bore the burden of proving the length of time for which the plaintiff should be awarded back pay. However, the Court's comment immediately after discussing what "Banks was entitled to argue"—that "[a] jury would be permitted but not necessarily required to accept that inference"—suggests that, in the Second Circuit's view, the plaintiff bore the burden. *Id*.

In the absence of clear guidance from the Second Circuit, this Court concludes that, in the specific circumstances of this case and in the exercise of its equitable

discretion to make plaintiff whole without providing a windfall, plaintiff was required to prove his entitlement to back pay beyond the change in administration from Suozzi to Mangano. As noted above, the Court's starting point in assessing damages under § 1983 actions is the common law of torts. *See Stachura*, 477 U.S. at 306. "Plaintiffs must prove every element of a Section 1983 claim by a preponderance of the evidence, 'including those elements relating to damages.'" *Wallace*, 809 F. Supp. 2d at 80. Proof of damages may not be "contingent, uncertain, or speculative," and when assessing such proof, the common-law concept of foreseeability remains a primary consideration. *Id*. at 80-81. Even if a defendant's action was the but-for cause of a particular injury, the defendant will not be held liable if his conduct was not the proximate cause; in other words, § 1983 defendants remain responsible only for damages that are reasonable foreseeable. *Id*.

A crucial distinction between this case and the after-acquired evidence cases under Title VII and the ADEA, and similar cases involving plaintiffs entering or leaving long-term careers, is that it was never foreseeable that this plaintiff would continue as a salaried employee of the NCPD for much longer than he did. The uncertainty surrounding plaintiff's future developed long before he was ever terminated and has been apparent in this case since its early stages. Thus, unlike other plaintiffs who might not be expected to disprove their employers' post-hoc attempts to reduce a back pay award, this plaintiff's entire claim—the precursor to his request for back pay—arose in a context where he was being recommended for termination because of his minimal duties and the budgetary need to cut jobs. Under these circumstances, in order to recover back pay through the date of judgment, plaintiff was required to

overcome this evidence with proof that he would have been retained, despite the odds against it. In other words, assigning the ultimate burden to plaintiff strikes an appropriate balance between the common-law rule that a plaintiff must prove damages and the remedial purpose of § 1983 because the unlawful retaliation in this case occurred at a moment when plaintiff was far more likely than almost every other member of the NCPD to be fired for other, lawful reasons. Simply presuming that plaintiff would continue his employment through the date of judgment, absent any showing by plaintiff, would result in a damages award that is "merely speculative or contingent," *Wallace*, 809 F. Supp. 2d at 88, and would resemble adherence to a mechanical rule rather than "special treatment in an appropriate case." *Holland*, 560 U.S. at 650.

Having heard the case at trial and thorough reviewed the record of trial, the Court concludes that plaintiff has not carried his burden to show that he would have been retained past December 31, 2009, much less to the date of judgment. In fact, no witness testified about the likelihood of his retention in the Mangano administration. Although plaintiff points to evidence that his position was included in the NCPD budget for 2010, that budget was created when Suozzi remained county executive. Thus, the evidence that plaintiff's position survived under Suozzi is not persuasive concerning its future under Mangano, particularly because Mangano chose to retain Mulvey, who had wanted to terminate plaintiff for several years (for reasons unrelated to First Amendment activities), and was only prevented from doing so by Suozzi.[12]

---

[12] The County has also relied on the fact that Mangano chose not to re-hire plaintiff when plaintiff asked him to do so, arguing that Mangano's decision was an act of "independent judgment" that breaks the

In sum, the Court agrees with the County's argument in a broader sense: that plaintiff is not entitled to back pay beyond the date of the change in administration, simply because it was not foreseeable that plaintiff would have kept his position. The Court views the change of administration as a superseding cause, which is part of the common-law doctrine of proximate cause, *see In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 772 F. Supp. 2d 519, 541 (S.D.N.Y. 2011), an element on which plaintiff bears the burden of proof, including in § 1983 cases.[13]   *Higazy v. Templeton*, 505 F.3d 161, 180 (2d Cir. 2007) (Jacobs, C.J. concurring); *Townes*, 176 F.3d at 146-47.   Here, the change in administration occurred for reasons having nothing to do with plaintiff's termination. Plaintiff himself testified that, when Mangano was elected, he was under pressure from both the county legislature and the Nassau Interim Finance Authority to cut costs, and that he had to proceed cautiously as a new county executive.   (Tr. at 275.)   Moreover, Mulvey who stayed on as Police Commissioner for a period of time when Mangano became County Executive, had expressed his desire to terminate plaintiff going back to 2007 for reasons unrelated to First Amendment activity, and was prevented from doing so by Suozzi. Although plaintiff supported Mangano, there is no evidence that Mangano would have protected plaintiff in the same way Suozzi had.   It is, therefore, unforeseeable that a non-civil service Assistant Commissioner position, which had historically not even been a salaried position, would have remained where its occupant had been stripped of most responsibilities, placed on a list of people whose jobs could be eliminated without impacting the police mission, and actually recommended for termination multiple times by the Deputy County Executive for Public Safety and the NCPD Commissioner, the latter of whom continued to serve in the Mangano administration.

---

causal chain between plaintiff's unlawful termination and any ongoing entitlement to back pay.   *See Wallace*, 809 F. Supp. 2d at 80. However, "[s]uch an intervening act must be a new and independent force, which was not set in motion by the defendant's own wrongful acts." *Zahrey v. City of New York*, No. 98-4546 (DCP)(JCF), 2009 WL 1024261, at *4 (S.D.N.Y. Apr. 15, 2009) (internal quotation marks and citations omitted).   Plaintiff argues that Mangano's decision cannot be characterized as truly "new and independent," since it was influenced, if not "set in motion," by the fact that plaintiff had already been fired. Plaintiff contends that, in a constrained budget environment, it was simply easier for Mangano not to re-hire plaintiff than it would have been to choose him for firing in the first place. However, even assuming *arguendo* that Mangano's decision to not re-hire does not amount to a superseding cause, there is overwhelming evidence (as noted above) that plaintiff would have been terminated by Mulvey as soon as Suozzi left office because Mulvey had been seeking to terminate plaintiff since 2007 (for reasons unrelated to the First Amendment) and Suozzi was the only person preventing that termination.   There is no evidence, and no rational basis to conclude, that Mangano would have prevented Mulvey from terminating plaintiff (especially given the constrained budget environment).

[13] Plaintiff argues that the County bore the burden to prove a superseding cause, but the case he cites from this district discussed a burden of production, not the ultimate burden of proof on the question of proximate cause.   *See Ramey v. Dist. 141, Int'l Ass'n of Mach. & Aerospace Workers*, 473 F. Supp. 2d 365, 370 (E.D.N.Y. 2007).   Plaintiff also relies on *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 757 (7th

Cir. 2011), but in that case it is unclear whether the Seventh Circuit meant to impose an ultimate burden of persuasion or simply a burden of production on the defendant. In any event, even if the County bore a burden here, it carried its burden by presenting the evidence discussed herein concerning plaintiff's history with Mulvey and Suozzi and the tenuousness of plaintiff's position in 2009, and plaintiff has not overcome that evidence with proof that he would have kept his job.

Limiting plaintiff's back pay award to the end of the Suozzi administration is consistent with the compensatory, non-punitive purpose of damage awards under § 1983. *Carey*, 435 U.S. at 255 ("[T]he basic purpose of a § 1983 damages award should be to compensate persons for injuries."). As the Court has discussed, compensating plaintiff requires a close examination of his particular circumstances in order to locate a just result, and his circumstances are quite different from cases where employment would ordinarily continue uninterrupted. Plaintiff had already retired once and been out of police work for ten years. Then, even after he returned to the NCPD, his position changed quite dramatically: in 2007, he was given both a $9,000 raise and less work to do. That level of compensation for plaintiff's minimal duties would not have continued but for Suozzi's unwillingness to fire plaintiff, both when Mulvey asked him to in 2007, and when Ryan recommended it multiple times throughout 2009. Thus, the Court concludes that awarding any compensation for back pay beyond Suozzi's term in office would be a windfall for plaintiff that would not serve the compensatory purpose of damages under § 1983, and would instead simply punish the County by forcing it to pay four years' worth of additional salary to an employee who was deemed expendable even within the administration that hired him, and which has since left office.[14]

Accordingly, the award of back pay is limited to the end of the Suozzi administration on December 31, 2009, and plaintiff's motion for reinstatement or front pay is denied.

### D. Compensatory Damages

Defendants also argue that the jury's award of $150,000 in compensatory damages was excessive, and requires either a new trial on damages or remittitur of the award.

"In determining whether a jury's award is excessive, courts take into account awards rendered in similar cases, 'bearing in mind that any given judgment depends on a unique set of facts and circumstances.'" *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35, 45 (E.D.N.Y. 2009) (quoting *Scala v. Moore McCormack Lines,* 985 F.2d 680, 684 (2d Cir. 1993)). "A jury's award of damages may not be overturned unless it is so excessive that it shocks the conscience of the court." *Id.* (internal quotation marks and citations omitted).

The $150,000 award here does not shock the Court's conscience. Even defendants concede that the general range of awards in

---

[14] Finally, although the Court has emphasized Suozzi's protection of plaintiff in the discussion of the back pay award, there is a clear distinction between this form of political protection and the requirements of the *Elrod-Branti* test, which determines whether "party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518. There is no evidence that the "public office involved," the Assistant Commissioner of NCPD, required a particular party affiliation. As is discussed

above, it is unclear what the position required. Although the position's occupant (plaintiff) happened to receive protection from Suozzi, the evidence does not support a conclusion that such protection was in any way related to the functions or performance of plaintiff's job, which did not meet the *Vezzetti* factors. In fact, Suozzi reconstituted plaintiff's job in order appease Mulvey, leaving plaintiff powerless, isolated, and distinct from policymakers in other cases. (Tr. at 621 (Mulvey referring to plaintiff's job as one "created by the county executive.").) The County was unable to show that this reconstituted position met the *Elrod-Branti* test, but that failure of proof does not affect the Court's conclusion that plaintiff would not foreseeably have remained in the position once Suozzi left office.

similar cases extends at least to $125,000, *see* Def. Mem. at 13 (citing *Olsen*, 615 F. Supp. 2d at 46), and the Second Circuit affirmed the award of up to $125,000 in "mental anguish damages" where there was no evidence of "physical sequelae or professional treatment." *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 77 (2d Cir. 2004) (applying less deferential New York standard of review); *see also Lore v. City of Syracuse*, 670 F.2d 127, 179 (2d Cir. 2012). Thus, the award in this case is quite close to what is often approved, and $125,000 is not a hard cap in cases of this type. In fact, courts in this district recently approved awards of $175,000 and $200,000 for emotional distress where, as here, there was no medical evidence and the damages were supported solely by the plaintiff's testimony. *See, e.g., Tretola v. Cnty. of Nassau*, 14 F. Supp. 3d 58, 80-84 (E.D.N.Y. 2014) (remitting emotional distress award to $175,000 where plaintiff testified that he was humiliated and ostracized by friends in law enforcement, and had trouble sleeping and stomach pains); *Wallace v. Suffolk Cnty. Police Dep't*, No. 04-CV-2599 (RRM)(WDW), 2010 WL 3835882, at *8-9 (E.D.N.Y. Sept. 24, 2010) (declining to remit $200,000 award where plaintiff testified that he suffered from sleepless nights, became tense, agitated, worried, and more quick-tempered, and the condition continued through the time of trial); *see also Jowers v. DME Interactive Holdings, Inc.*, No. 00 Civ. 4753 LTS KNF, 2006 WL 1408671, at *3 (S.D.N.Y. 2006) ("When determining damages for mental anguish, a plaintiff's recovery is not preconditioned on whether she underwent treatment, psychiatric or otherwise.").

Having borne in mind, as it must, this case's "unique set of facts and circumstances," *Scala*, 985 F.2d at 684, the Court concludes that $150,000 is not excessive, particularly in light of plaintiff's testimony concerning the emotional and physical toll of his firing. (*See, e.g.*, Tr. at 278 ("Other than what I just described . . . ongoing anxiety . . . . I haven't had a decent night's sleep since that happened. I wake up during the night. And I still am asked by folks all this time later why I was terminated."); 279 (describing "intense headaches that I never suffered my entire life" and "an upset stomach a couple of times a week").) In the Court's view, the jury's award was not conscience-shocking or excessive, but rather was reasonably based upon plaintiff's testimony regarding his emotional distress.

Therefore, defendants' motion for remittitur or a new trial on damages is denied.

### III. CONCLUSION

Under the particular circumstances of this case and in the exercise of its equitable discretion, the Court awards plaintiff back pay from November 13, 2009, to December 31, 2009, the time period when it was foreseeable that he would remain employed as Assistant Commissioner. Plaintiff's motion for reinstatement and front pay are denied.

The County's renewed Rule 50 motion is denied because leave to amend the answer to include the policymaker defense was properly denied in the Court's discretion and, in any event, the County did not demonstrate that the defense applies to plaintiff's position. The County's separate motions concerning the jury instructions and compensatory damages are also denied, because the jury charge defined "motivating factor" in the same way as the Second Circuit has done, and because the $150,000 compensatory damage award does not shock

the Court's conscience in this case and was not excessive.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 31, 2015
Central Islip, NY

* * *

Plaintiff is represented by Rick Ostrove and Matthew Brian Weinick of Leeds Brown Law, P.C., One Old Country Road, Suite 347, Carle Place, NY, 11514. Defendants are represented by Mark S. Mancher, Marc S. Wenger, and Daniel Sergio Gomez-Sanchez of Jackson Lewis LLP, 58 S Service Road, Suite 410, Melville, NY 11747.